GUNAY LAW, P.C.
Petek Gunay (PG 2695)
845 Third Avenue, 6th Floor
New York, New York 10022
Telephone: 646-290-5081
Facsimile: 212-412-9012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREY JEAN TECHNOLOGIES LLC<br><br>*Plaintiff,*<br><br>-against-<br><br>ZIBTEK LLC,<br><br>*Defendant.* | 16 CV 8036<br><br>**COMPLAINT** |

Plaintiff Grey Jean Technologies LLC ("Grey Jean"), by and through its attorney, Gunay Law, P.C., hereby alleges as and for its Complaint (the "Complaint") against Zibtek LLC ("Zibtek" and, together with Grey Jean, individually and collectively, the "Parties") as follows:

**INTRODUCTION**

1.      This is an action seeking, *inter alia,* damages arising out of multiple egregious breaches of a consulting agreement and a confidentiality agreement by Zibtek, a software developer that had been hired by Grey Jean for the specific purpose of developing Grey Jean's technology software, Genie (previously called Flik, *i.e.* the "Product"), a cloud based artificial intelligence predictive platform to be used in the retail industry.  Despite specifically agreeing and promising to deliver work product in accordance with quality standards of Grey Jean, Zibtek completely failed to do so,

1

repeatedly delivering sloppy, unsatisfactory and below-par work product, and requiring a significant investment of time and monies from Grey Jean.

2.      To add insult to injury, Zibtek unilaterally stopped work in the middle of Grey Jean's first client integration, without notice and in violation of its contractual obligations, holding hostage and refusing to return to Grey Jean valuable intellectual property pertaining to the Product (which belonged exclusively to Grey Jean), in breach of not one, but two agreements between the Parties.

3.      Zibtek's conduct and omissions have caused, and are continuing to cause, Grey Jean substantial damages, *inter alia*, loss of a significant amount of data, at least six clients and significant revenues, as well as exorbitant expenses incurred in connection with hiring replacement developers on an emergency basis to rewrite and rebuild code for the Product.

## THE PARTIES

4.      Grey Jean is a Delaware limited liability company, with its principal place of business located in the State of New York, County of New York.

5.      Upon information and belief, Zibtek is a Utah limited liability company, with its principal place of business located in the State of Utah.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §1332 in that complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2).

8.      This Court has jurisdiction over Zibtek pursuant to NY CPLR § 302.

2

## FACTUAL ALLEGATIONS

9.      Plaintiff Grey Jean is a technology company offering technological solutions aimed at improving customer acquisition and sales across multiple retail channels.

10.     Zibtek is a software development company.

11.     On or about December 4, 2014, Grey Jean, on the one hand, and Zibtek on the other, entered into a Consulting Agreement (the "Consulting Agreement") whereby Grey Jean retained Zibtek as a consultant to provide certain services at the monthly rate of $13,500.00 (for three developers, called "resources").  Specifically, Zibtek was to provide various software engineering, technical, product development and quality assurance ("QA") services and other duties to be mutually agreed upon by the Parties (the "Services") in connection with the development of the Product.  At or around the same time, the Parties also entered into a Mutual Confidentiality Agreement (the "Confidentiality Agreement"[1] and, together with the Consulting Agreement, the "Agreements") in connection with the project.

12.     In the Consulting Agreement, Zibtek agreed, *inter alia*, to "undertake and complete the Services".  The Consulting Agreement was to continue until such completion or proper termination by a Party[2].  Consulting Agreement, pars. 1, 6 and Exhibit A.

---

[1] Zibtek's confidentiality obligations under the Confidentiality Agreement were specifically confirmed in the Consulting Agreement.   Consulting Agreement at par. 2(e).

[2] Grey Jean could properly terminate the Consulting Agreement at any time or scale down resources, however, Zibtek could only terminate the Consulting Agreement on thirty days' written notice and then, only in the event of an uncured material breach by Grey Jean. *Id.* at pars. 6, 9, Exhibit A.

13.     The Consulting Agreement also contained, among other things, warranties and promises that Zibtek would perform the Services in a professional and workmanlike manner and produce results satisfactory to Grey Jean.  Zibtek was required to indemnify Grey Jean from "any and all claims, damages, liability, settlement, attorneys' fees and expenses, as incurred, on account of … any breach of th[e] Agreement or any other action or inaction of [Zibtek]".  *Id.* at pars. 1, 3, 5, 7 and Exhibit A.

14.     The Parties thus started their association, initially starting to work on a prototype for the Product.

15.     Zibtek largely performed the Services through developers based in India, which Zibtek represented to Grey Jean to be Zibtek employees.

16.     Grey Jean begun the engagement with Zibtek for version 1 or prototype of the software, commonly known in the industry as an "MVP" or "minimal viable product".  MVPs are never production ready and, as such, with all software developments, additional capabilities had to be built on top of the MVP.

17.     Zibtek's initial performance appeared on the surface to be satisfactory; thus, Grey Jean added resources to the Zibtek development team, at one point having four developers on the project.

18.     The Product comprises a combination of complex big data algorithms and standard programming. Grey Jean managed the complex algorithms in-house under the supervision of Tom Lorenc, Grey Jean's Chief Technology Officer, and the standard and less complex issues were handed off to Zibtek.

19.     Grey Jean invested heavily in the Zibtek team.  Tom Lorenc was required
to coordinate all development. Among other things, Mr. Lorenc held daily calls[3] with the
Zibtek team to get updates, provide new instructions and to assist Grey Tech in solving
problems that would arise.  In the process of managing Zibtek, Mr. Lorenc also trained
members of the Zibtek team and imparted to them technical abilities which they did not
have.

20.     As time went by, Zibtek team's work quality started deteriorating and
serious questions arose as to the competence of Zibtek resources to perform the Services.
On several occasions, Grey Jean had to ask for replacement of Zibtek resources because
they could not perform development services at the most basic level, even after receiving
detailed instructions and significant guidance from Grey Jean.  Zibtek however replaced
those individuals with other junior and inexperienced resources. The training process
would then begin again.[4]

21.     During the course of 2015, as the requirements grew from a simple MVP
towards a fully specified product following significant client interest in the Product, the
inability for Zibtek to deliver became increasingly obvious.   In addition to existing
issues, the work performed by Zibtek became increasingly sub-par and riddled with an
exorbitant amount of bugs and issues, regularly requiring significant time commitment
from Grey Jean employees to correct.

---

[3] Tom Lorenc, the Zibtek development team including Kipp Sorensen (who Zibtek represented to be in charge of product management and QA) and Tushar Apshankar (the head developer for the project who was based in India) participated in these calls, commonly known as "scrums".

[4] In fact, upon information and belief, Zibtek was intentionally resourcing the team with junior developers so that they could be trained by Grey Jean personnel.

22.    The ongoing issues were tracked by creating "tickets" on a program called "Jira", the existence of which tickets would indicate unresolved, outstanding issues. Development tasks, which had been deemed "closed" or "done", had to be opened time and time again as they failed testing, and caused other parts of the software to fail.

23.    Grey Jean also had to put in place extensive testing procedures to supplement the seemingly non-existent QA process from Zibtek.

24.    In or about August 2015, upon Grey Jean preparing to acquire its first customer for the Product, the Parties' focus shifted completely to building an enterprise production ready product which could be deployed for Grey Jean's retail customers.

25.    In connection with the building of a production system that needed to be ready for launch, Zibtek required even more handholding than it ever had before. In fact, the bugs and system issues with the Product had become so pervasive and overwhelming that Grey Jean Chief Technology Officer Tom Lorenc could hardly perform his own duties as an officer of Grey Jean, instead regularly having to take time away to focus on programming capabilities and junior level work that Zibtek had specifically been hired to do, but which Zibtek developers simply could not handle.

26.    On many occasions, Mr. Lorenc had to work with the Zibtek team on India time – overnight in New York – and still come to work the following day to perform his duties as an officer of Grey Jean. In fact, this process was so commonplace that Tom Lorenc's health started failing. Mr. Lorenc nevertheless continued to cheer on the Zibtek team, with the hope that the persistent issues would be resolved. All this time, Grey Jean continued to pay Zibtek's monthly charges.

27.     Zibtek continuously acknowledged the ongoing problems and would attempt to put temporary bug fixes in place, many of which failed in the long run and which, in any event, did not fix most of the issues.  Even with those fixes, significant issues remained.

28.     In or about mid January 2016, the problems had become so severe that it had become impossible for Grey Jean to meet its obligations to its customers. At this time, Grey Jean started its first real customer integration with a regional company with multiple stores.

29.     For a start-up company like Grey Jean, attempting to launch a new technological product in the very crowded and highly competitive retail space, this event was particularly crucial.  However, on the very day before Grey Jean's most significant presentation to this first client, a new and extremely critical issue surfaced, when push notifications for the Product[5] failed.   This was significant because the cornerstone of Grey Jean's value proposition to its clients was its ability to send customized and contextually relevant push notifications to a retailer's customers by a push notification on the client's app, at the right time and place.

30.     On or about January 20, 2016, Cosmas Wong, the President of Grey Jean, thus promptly contacted Zibtek's Chief Executive Officer, Cache Merrill, to address the issue.  Mr. Merrill acknowledged the significant ongoing issues, and promised that there would be more supervision and accountability from his company.  Among other things, Mr. Merrill represented that all issues would promptly be fixed, and estimated that it would take approximately two weeks for Zibtek to do so.

---

[5]      A push notification is a notification communicated by an app publisher to a user.

31.     Messrs. Wong and Merrill thus agreed, consistent with the Consulting Agreement, that Grey Jean would make only half of the payment that would otherwise be paid that month, with the remainder to be paid pending and contingent upon satisfactory remedying of the many open issues.  For example, as of such date, there were up to twenty four (24) open tickets on Jira, *see* par. 22 above, concerning the Product's loyalty calculator, a function offered by the customer to track and reward customer loyalty, which calculator needed to be replicated and built into the Product.  The client's loyalty calculator (a simple mathematical calculator that tracks the number of points per dollar spent) had to be revisited over and over again as it simply did not work.

32.     As of February 9, 2016, the issues had yet to be resolved and, had in fact been exacerbated; as such, Grey Jean had not yet paid the second portion of the payment.

33.     Zibtek however claimed that it was getting pressure from its "director in India" to pay and threatened to pull off its personnel off the project because it did not have the cash reserve to continue paying said developers while working on fixing the significant bugs in its work product, as it had promised.  Zibtek's statements indicated, among things, that the development team in India were contractors to Zibtek, and not employees as had previously been represented to Grey Jean.

34.     On or about February 9, 2016, Zibtek informed Tom Lorenc that it had stopped work, and completely walked away from its obligations, in the middle of the client integration.

35.     At such time, neither had the Services been completed, nor had Grey Jean breached, or Zibtek duly terminated on thirty days' notice, the Consulting Agreement, as

required under that Agreement.  Moreover, Zibtek had also not fixed the issues it had

promised promptly to fix in mid January.

36.     Shortly thereafter, Grey Jean learned that Zibtek had failed to "check in"

the code for the Product for days. In connection with the Services provided under the

Consulting Agreement, Zibtek was entrusted to hold, and required to check in, the code

for the Product (the "Code"), which belonged exclusively to Grey Jean under the

Consulting Agreement.  This meant that every day, Zibtek was to put into a tracking

system the latest Product developments, essentially building upon the prior version, and

saving the current version, of the Code.

37.     Moreover, despite due request from Grey Jean, Zibtek wrongfully refused

to release and return to Grey Jean its Code unless Grey Jean paid over $14,000 in

exchange for such release.   In a February 12, 2016 email to Messrs. Wong and Lorenc,

Zibtek principal Cache Merrill stated:

> If you can make that payment today via electronic method we can have the
> dev team send you the latest work on their machines, and also delete all
> copies of your software from their work stations on Monday morning first
> thing.

38.     Of course, Zibtek had no contractual right to retain any part of the Code.

Under the Agreements, all work product developed by Zibtek belongs exclusively to

Grey Jean and had to be returned immediately upon termination or demand by Grey Jean.

The Consulting Agreement provides, *inter alia*:

> [Grey Jean] shall own all right, title and interest (including patent rights,
> copyrights, trade secret rights, mask work rights, trademark rights, sui
> generis database rights and all other intellectual and industrial property
> rights of any sort throughout the world) relating to any and all inventions
> (whether or not patentable), works of authorship, mask works,
> designations, designs, know-how ideas and information made or
> conceived or reduced to practice, in whole or in part, by [Zibtek] in

connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and [Zibtek] will promptly disclose and provide all Inventions to [Grey Jean]. All Inventions are work for made for hire to the extent allowed by law and, in addition, [Zibtek] hereby makes all assignments necessary to accomplish the foregoing ownership. [Zibtek] shall assist [Grey Jean], at [Grey Jean's] expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned. [Zibtek] hereby irrevocably designates and appoints [Grey Jean] as its agents and attorneys-in-fact, coupled with an interest, to act for and on [Zibtek's] behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by [Zibtek]

[Zibtek] agrees that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and [sic] information relating to customers or employees) [Zibtek] learns, develops or obtains in connection with the Services or that are received by or for [Grey Jean] in confidence, constitute "Proprietary Information". **Consultant shall** hold in confidence and **not** disclose, or **except in performing the Services, use any Proprietary Information.** However, [Zibtek] shall not be obligated under this paragraph with respect to information Consultant can document is or becomes readily publicly available without restriction through no fault of [Zibtek]. **Upon termination or as otherwise requested by [Grey Jean], [Zibtek] will promptly return to [Grey Jean] all items and copies containing or embodying Proprietary Information, except that [Zibtek] may keep its personal copies of its compensation records and this Agreement.**

Consulting Agreement pars. 2(a) and (b) (emphasis supplied).

39.     The Confidentiality Agreement, which confirms and affords similar

protections to Grey Jean's confidential and proprietary information similarly provides:

> **Immediately upon a request by the Disclosing Party** [here, Grey Jean] **at any time, the Receiving Party** [here, Zibtek] **will turn over to the Disclosing Party all Confidential Information of the Disclosing Party and all documents or media containing any such Confidential Information and any and all copies or extracts thereof.**

Confidentiality Agreement Par. 2 (emphasis supplied).  Notwithstanding its clear

obligations under the Agreements, Zibtek wrongfully retained and refused to return all

such information and, as of the commencement of this action, has yet to return same to Grey Jean, its rightful owner.

40.     Due to Zibtek's failure to perform its obligations under the Agreements, including, but not limited to, the unilateral and wrongful termination of the Services, wrongful neglect and failure even to notify Grey Jean that it had not been checking the Code as it was obligated to do, and unlawful retention of the Code, Grey Jean lost a significant amount of work, information, data and product development, and had to scramble to hire, on an emergency basis, replacement resources, essentially to rewrite and rebuild the Code from scratch, and suffering significant monetary damages, among other things.  Despite best efforts of Grey Jean personnel and the newly hired consultants, Grey Jean nevertheless was unable to deliver results on schedule, thus losing at least six clients, and significant revenues.

41.     Start-up companies like Grey Jean take on significant risks by virtue of being new. They rely on development companies like Zibtek to keep their part of the bargain and act in accordance with their contractual obligations. Zibtek's role was crucial in the development of Grey Jean's Product and its growth as a new company and Grey Jean invested heavily in this relationship.  In fact, as of the time of the unilateral and unauthorized termination of the Services, Zibtek had received from Grey Jean nearly $200,000.00, which payment represented Grey Jean's single largest expense and investment in its Product, requiring a significant portion of the funds initially raised by Grey Jean.

42.     Despite having received approximately $200,000.00 in consulting fees and Grey Jean having invested heavily to train the multiple Zibtek developers with advanced

11

programming skills which Zibtek could utilize with other customers, Zibtek completely failed to get Grey Jean's software ready for production or to deliver value as promised. Zibtek was not interested in the quality of its work product and would not take responsibility for its shortcomings, notwithstanding clear language of the Consulting Agreement. *See id.* at par. 3(i)("the Services will be performed *in a professional and workmanlike manner*…"); par. 5 ("…Consultant shall be *wholly responsible* for the professional performance of the Services by the Assistants *such that the results are satisfactory to the Company*."); and Exhibit A ("Consultant shall use Consultant's *best efforts* to perform the Services *such that the results are satisfactory to the Company*.")

43.    Zibtek treated Grey Jean like a gravy train, did not meet quality standards, resourced the Product development with inexperienced developers it knew could not handle the work (and which Zibtek knew Grey Jean had to train), failed to provide the QA and testing it was required to provide, wholly violating its various duties and obligations to Grey Jean.   An internal review of issues has in fact revealed that over 900 tickets, representing various tasks, issues and bugs were opened in Jira, further evidencing the vast number of issues Grey Jean had faced as a result of Zibtek's underperformance.

44.    Moreover, Zibtek wrongfully retained, misappropriated and refused to return to Grey Jean, Grey Jean's valuable intellectual property pertaining to the Product (which belonged exclusively to Grey Jean), in breach of not one but two agreements between the Parties.

45.     Due to the conduct and omissions described above, Grey Jean lost, *inter alia,* at least six clients and millions of dollars in revenues Grey Jean would have collected but for Zibtek's egregious breaches of the Agreements.

## COUNTS

### COUNT 1 – Breach of Contract
### (Consulting Agreement)

46.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

47.     The Parties entered into a valid Consulting Agreement as set forth above.

48.     Grey Jean performed all of its obligations under said agreement.

49.     By the conduct and omissions described above (*inter alia,* by failing and refusing to provide workmanlike work product satisfactory to Grey Jean, failing and refusing to complete the Services and abandoning its duties in bad faith and without notice to Grey Jean, wrongfully retaining and refusing to return Grey Jean's intellectual property and using same in an improper effort to squeeze monies out of Grey Jean), Zibtek materially breached the Consulting Agreement.

50.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $ 5,606,045.45 plus attorneys' fees and costs.

### COUNT 2 – Breach of Contract
### (Confidentiality Agreement)

51.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

52.     The Parties entered into a valid Confidentiality Agreement as set forth

above.

53.     Grey Jean performed all of its obligations under said agreement.

54.     By the conduct and omissions described above, Zibtek materially breached the Confidentiality Agreement.

55.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

## COUNT 3 – Breach of Covenant of Good Faith and Fair Dealing

56.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

57.     By the conduct and omissions described above, Zibtek breached the implied covenants of good faith and fair dealing found in both Agreements.

58.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

## COUNT 4 – Unjust Enrichment

59.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

60.     Zibtek has been unjustly enriched at Grey Jean's expense and has received monies and value which equity requires it return.

61.     Grey Jean has been damaged as a result Zibtek's actions, in an amount to be determined at trial, but in no event less than $198,545.45 plus attorneys' fees and costs.

14

## COUNT 5 – Breach of Warranty

62.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

63.     By the conduct and omissions described above, Zibtek breached its express and implied warranties, *inter alia,* that it would perform the Services in a manner that is professional and workmanlike and satisfactory to Grey Jean.

64.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

## COUNT 6 – Conversion

65.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

66.     Grey Jean had absolute title and/or right to possess its intellectual property, including the Code for the Product and any and all improvements thereon. Zibtek's actions in wrongfully retaining and holding same hostage in exchange for payment, and refusing to return same when Grey Jean duly so requested constitutes conversion.

67.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

## COUNT 7 – Replevin

68.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

69.     Grey Jean has title and/or right to possess the all intellectual property pertaining to the Product, *inter alia,* the Code and any and all improvements thereon.

70.     Zibtek's actions and omissions in wrongfully retaining and failing to return same when Grey Jean duly so requested require replevin relief.

71.     Grey Jean is entitled to the return of all of its intellectual property, including, but not limited to, all such property pertaining to the Product and/or the Code and any and all improvements thereon.

### COUNT 8 – Wrongful Use and Misappropriation of Trade Secrets, Confidential and Proprietary Information

72.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

73.     The Product and other intellectual property relating thereto including the code constitute trade secrets, and confidential and proprietary information of Grey Jean.

74.     Zibtek has used and is continuing to hold and wrongfully use such intellectual property in breach of the Agreements, its confidential relationship with and duties to Grey Jean.

75.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

### COUNT 9 – Permanent Injunction

76.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

77.     Both of the Agreements recognize that breach of provisions pertaining to Grey Jean's intellectual property, *inter alia,* Grey Jean's confidential and proprietary

information, would cause irreparable harm for which damages would not be an adequate remedy, thus entitling Grey Jean to injunctive relief in addition to any other damages.

78.     Grey Jean is entitled to a permanent injunction enjoining and barring Zibtek from using any property and information of Grey Jean in any way whatsoever and directing Zibtek promptly to return all such information to Grey Jean.

### COUNT 10 – Negligence

79.     Grey Jean incorporates by reference all preceding and succeeding paragraphs of this Complaint.

80.     Zibtek was entrusted to hold and owed a duty to Grey Jean to check in on a daily basis the Code for the Product so that the progress of Product's development could be tracked and preserved.

81.     By failing to check in the Product code on a daily basis as it was required to do, and by failing to notify Grey Jean, Zibtek breached this duty, proximately causing Grey Jean to incur substantial damages, including loss of a significant amount of data and other damages incurred in connection with rewriting and rebuilding of the code.

82.     Grey Jean has been damaged as a result of Zibtek's actions, in an amount to be determined at trial, but in no event less than $5,606,045.45 plus attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

   a.     Damages in an amount to be determined at trial, but in no event less than $5,606,045.45;

17

b.      Recoupment of all fees paid to Zibtek pursuant to the Consulting
        Agreement in an amount to be determined at trial, but in no event less than
        $198,545.45;

c.      Permanent Injunction barring and enjoining Zibtek from using in any way
        whatsoever any confidential and proprietary information of Grey Jean,
        including any trade secrets, and any data or information pertaining to the
        Product and/or the Code and any and all improvements thereon;

d.      Return of any and all intellectual property of Grey Jean pertaining to Grey
        Jean and/or the Product, including, but not limited to the Code;

e.      Court Costs;

f.      Attorneys' Fees; and

g.      Such other and further relief as this Court deems just and proper.


Dated: New York, New York
       October 14, 2016

                                        Respectfully submitted,

                                        GUNAY LAW, P.C.
                                        *Attorney for Plaintiff*
                                        *Grey Jean Technologies LLC*


                                        By_____
                                            Petek Gunay (PG 2695)
                                            845 Third Avenue, 6th Floor
                                            New York, New York 10022
                                            (646) 290-5081

18